# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

### CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>vs.<br><br>PATRICK KEVIN MEDEARIS,<br><br>     Defendant. | 3:20-CR-30077-RAL-1<br><br>**REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS AND REQUEST FOR FRANKS HEARING** |

In this prohibited person in possession of a firearm case, Patrick Kevin Medearis seeks to suppress evidence seized pursuant to a search warrant and statements he made during a custodial interview. Medearis also requests a *Franks* hearing. Because law enforcement obtained (1) the warrant in good-faith and without recklessly misleading the issuing judge and (2) Medearis's statements in accordance with *Miranda*, and the Fifth Amendment, both the suppression motion and hearing request, pending, should be denied.

## BACKGROUND

In March and April 2020, various individuals provided tribal law enforcement, in the Rosebud, South Dakota area, with information connecting Medearis and India Ford (India) with the use and sale of drugs. The informants also identified Medearis as a possessor of firearms.

At 2:26 p.m. on April 21, 2020, Kara Ford (Kara) called Rosebud Sioux Tribe Law Enforcement Services (RSTLES) and reported that Medearis was chasing and shooting at her vehicle near Mission. Dispatched officers located Kara, along with her sister, India, on the side of a county road with a flat tire.

Around 4:00 p.m. that day, RSTLES Officers Joshua Antman and Gerald Dillon and RSTLES Special Agent Benjamin Estes interviewed India at the Tripp County Sheriff's Office. India informed the trio that she was in a relationship with Medearis but had tried to avoid him after an incident outside her house earlier that morning. During the morning's encounter, India said Medearis "had an ugly look on his face" and tried to hit her with his four-wheeler. In response, she fled to her mother's house, but later decided to return to Mission.

On her return trip to Mission, a white Hyundai Elantra turned around on a dirt road near Hidden Timber and chased her. According to India, Medearis waved and fired a silver pistol multiple times from the passenger side of the Elantra. After recounting the chase scene that ultimately led her to call RSTLES, India divulged information about a recent event in Norris. Describing it, India related that Medearis "flipped out and started waving his gun around" upon finding that someone had broken into his red Chevrolet Monte Carlo and stolen personal items and drugs, including marijuana and methamphetamine. India also disclosed that Medearis had sold drugs from their shared home and had struck her on the head with a pistol, knocking her down, a few days earlier.

2

Following the interview, Antman and Dillon made arrangements for India's flat tire to be fixed. Dillon gave his contact information to India, advising her to call or text him if Medearis showed up.

The next morning, at 8:14 a.m., Kara texted Dillon. She informed him that Medearis was trying to break into India's home near Mission. Dillon relayed the information to Antman and headed toward India's home to arrest Medearis for domestic abuse. In a later message, Kara stated that Medearis had left India's home in his Monte Carlo.

Dillon changed course, and proceeded to the residence of Medearis's father, Robert Medearis, where he knew Medearis stayed when he was on "the outs" with India. There, Dillon spotted the Monte Carlo parked behind the house, as well as a male getting into a silver Pontiac Grand Prix. He reported these observations to other officers and requested assistance.

When Dillon pulled into the driveway, the male, Medearis, exited the Grand Prix and ran toward the rear of the residence. Dillon followed in his patrol car while Medearis scurried toward a four-wheeler, but debris in the area punctured Dillon's tire. Dillon got out of his car and yelled at Medearis, but Medearis jumped on the four-wheeler and fled south on U.S. Highway 83.

Other officers arrived and pursued Medearis, who eventually circled through a field and raced back to the residence. On his return, Medearis dismounted the four-wheeler, ran to the Grand Prix, and sped off. But because Estes blocked the driveway

entrance with his vehicle when he arrived, Medearis swerved and plowed through a wire fence, continuing for roughly 100 yards before coming to a stop in a ditch along the highway. A bloodied Medearis complied with commands to exit the vehicle before being handcuffed.

Officers searched the Grand Prix and Medearis's person, discovering a shotgun, rifle, ammunition, two knives, drug paraphernalia, and 32 grams of suspected marijuana. When questioned about the blood on his chin and wound on his chest, Medearis stated that India stabbed him and that he had been cut by barbed wire. An ambulance arrived and transported Medearis to the Indian Health Service (IHS) Hospital in Rosebud. Medical providers subsequently airlifted Medearis to another hospital in Rapid City where he was treated and released.

As Medearis left the scene, officers secured the home. With the spare tire now on his vehicle, Dillon rushed off to the police station to get the search warrant documents he had saved for the India Ford/Patrick Medearis and the Robert Medearis residences. Dillon had prepared the documents earlier using information gleaned from several informants over the months before and kept them on hand for a time when they might be needed. But in his desire to swiftly get a warrant while the scene was still secure, Dillon did not bolster his supporting affidavit with information from the last two days.

At any rate, printed documents in hand, Dillon headed next door to the courthouse where a tribal judge reviewed them for roughly 20-25 minutes before granting the search warrant. Upon obtaining the warrant, officers began their search.

4

From the Robert Medearis residence, they seized multiple items including ammunition and drug paraphernalia. In the India Ford/Patrick Medearis residence, officers located drug paraphernalia, ammunition, and a sawed-off shotgun.

Just after midnight on April 27, 2020 (five days later), Medearis refused to pull over for a vehicle stop and led officers on another pursuit, this one involving speeds in excess of 100 mph. Eventually officers managed to stop Medearis on a gravel road using a spike strip, at which point Medearis fell out of his Monte Carlo. They observed a shallow self-inflicted wound on Medearis's neck, bandaged it, and called for an ambulance. The ambulance crew examined Medearis' chest wound and neck laceration, concluding that the injuries were minor and did not require further treatment.

Now medically cleared, officers took Medearis to the tribal correctional facility. Afterward, at about 9:40 a.m. the same day (April 27), Antman and Estes interviewed Medearis at the facility. They audio recorded the interview.

Antman and Estes introduced themselves and gathered biographical information, such as Medearis's date of birth and Social Security number. Estes then gave Medearis the *Miranda* advisement, after which the following exchange took place:

Estes: Do you understand what I read to you?

Medearis: Yeah.

Estes: Do you have any questions?

Medearis: Yeah.
Estes: What questions do you have that I, pertaining to what I just read to you?

5

(11 second pause)

Estes: You don't have any?

Medearis: Go ahead.

Estes: Okay, the waiver of rights portion, do you want to read it out loud, and read, read this part?

Medearis: I, I need my glasses.

Estes: Okay, it just, it just says that "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Do you agree with that? Did you want to talk to us?

Medearis: Yeah, I do, but-

Estes: Okay, if you do, go ahead and sign it here, it's up to you.

Medearis: Waiver of rights, hmm.

Antman: And you can still stop the interview whenever you want.

Medearis: Yeah.

Antman: If there's, if there's a particular question we're asking and you don't want to answer it, you don't have to answer if you don't want to. It just tells us that you know your rights and you're agreeing to answer any questions without a lawyer present.

Medearis: It feels like I'm breathing out of my neck.

Estes: Hmm?

Medearis: It feels like I'm breathing out of my neck, like air. Oh, but –

Estes: If you agree to talk to us, if you do, then, without a lawyer present, just go ahead and sign it right there.

Medearis: Probably sign it, and if that fucker gets out in the fucking free world, I'm fucked. I know that. Kick his shit again, it still looks all fucked up, eh?

6

Estes: Did you want to talk to us later on today? You want us to come back later on today? It's up to you.

Medearis: Let's just talk, let's go.

Estes: Okay, if you agree to talk to us without a lawyer present, just sign it right there.

Medearis: How about I initial it?

Estes: Okay.

Once Medearis initialed the form, Estes and Antman began questioning him and continued for a little more than a half hour. They asked him about the events India and the informants had chronicled and about his involvement with guns and drugs. Medearis repeatedly denied he possessed a certain pistol. When Medearis requested a lie detector test, officers ended the interview.

Within three months of the interview, a federal grand jury indicted Medearis for being a Prohibited Person in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(3), 924(a)(2), and 924(d). Medearis moves to suppress evidence obtained via the search warrant, as well as statements he made during the interview.[1] Medearis also requests a *Franks* hearing.[2] The government opposes the motion and request.[3]

---

[1] Docket No. 38.

[2] Docket No. 45; s*ee Franks v. Delaware*, 438 U.S. 154 (1978).

[3] Docket Nos. 41, 50.

## DISCUSSION

### A. The Warrant

### 1. *Franks* Hearing

Medearis claims that he is entitled to a *Franks* hearing because Dillon colored, or left out, facts in his affidavit that, if included, would have negated probable cause for the issuance of the search warrant.[4] To receive a *Franks* hearing, Medearis must first make a "substantial preliminary showing that the warrant's issuing judge relied on statements in an affidavit that were false or were omissions made knowingly and intentionally or with reckless disregard for the truth."[5] Such a showing "requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements."[6] A mere allegation without proof is not enough to satisfy this substantial burden.[7] Nor are allegations of negligence or innocent mistake sufficient to require a hearing.[8]

---

[4] Docket No. 45.

[5] *United States v. Mayweather*, 993 F.3d 1035, 1043 (8th Cir. 2021) (cleaned up); *see also Franks*, 438 U.S. at 155-56, 171-72.

[6] *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015).

[7] *Mayweather*, 993 F.3d at 1043.

[8] *Id.*

Instead, deliberate falsity or reckless disregard must be shown.[9] Medearis contends that "law enforcement intentionally or recklessly misrepresented or omitted facts surrounding [its] investigation."[10] But there is no evidence of intentionality here,[11] leaving only the possibility of reckless disregard.

The test for reckless disregard "is whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."[12] A showing of this kind is "not lightly met."[13] Additionally, the *Franks* challenger "must ... show that the alleged false statement or omission was necessary to the finding of probable cause."[14]

The government acknowledges that information was omitted from Dillon's affidavit.[15] The question then becomes whether Dillon, in omitting various facts from

---

[9] *Franks*, 438 U.S. at 155-56, 171-72.

[10] Docket No. 45 at 2.

[11] *See* Mot. Hr'g Tr. 62 (Nov. 10, 2021) ("Q. And you would never intentionally mislead a judge, would you? A. I would not.").

[12] *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010).

[13] *Id.* (quoting *United States v. Wajda*, 810 F.2d 754, 759 (8th Cir. 1987)).

[14] *Mayweather*, 933 F.3d at 1043 (quoting *United States v. Engler*, 521 F.3d 965, 969 (8th Cir. 2008)).

[15] *See* Docket No. 50 at 3 ("The government agrees that the affidavit does not include a complete summary of every interview or law enforcement contact referenced therein. Rather the affidavit contains information that is relevant to
(continued. . .)

his affidavit, would have had "serious doubts as to the truth of his statements." Dillon, a witness the Court found to be credible, testified that he included those facts in the affidavit which he considered "pertinent to the investigation" and not any potentially relevant information in the various interview reports.[16]

The omissions Medearis objects to include (1) relationships between confidential informants, (2) substance abuse, health, and legal issues of some informants, (3) how long one informant resided in the Rosebud area, and (4) certain informants being unsure or having conflicting information about where Medearis resided.[17] It remains unclear whether Dillon was even aware of many of the ancillary details that Medearis highlights as omitted. Dillon said that he did not listen to the recordings made of the interviews; instead, he relied on interview reports when available.[18] And in cases without a report or his own personal involvement, Dillon obtained his information by talking with the interviewing officer.[19]

---

establish probable cause for the search warrant.").

[16] *See* Mot. Hr'g Tr. 60 ("I included what I thought was pertinent to the investigation that we were doing that day.").

[17] *See* Docket No. 45 at 2-3.

[18] *See* Mot. Hr'g Tr. 52 ("Q. … the sources that you relied upon to establish probable cause, do you recall where you got that information? A. Yes, from memorandums of interviews.").

[19] *See* Mot. Hr'g Tr. 57 ("Q. We don't have an interview memo and you say that you didn't listen to the recording, so how did you know about this interview? A. … we all work together with the drug task force … it's not uncommon to discuss

(continued. . .)

While he did not rely on interview recordings for his information, nothing in the record gives the Court reason to believe that Dillon acted with reckless disregard for the truth or entertained any "serious doubts as to the truth of his statements."[20] Nor were the omissions critical to a finding of probable cause or the sort which would give an officer obvious cause to "doubt the accuracy of the information he reported."[21]

Dillon also made a typographical error in his affidavit. Paragraph 6 of the affidavit describes an event that took place on April 19, 2020, as having occurred on March 19, 2020.[22] Yet, "[a] mere typographical error does not establish a 'deliberate falsehood,' or a 'reckless disregard for the truth,' nor does it cast doubt on the affidavit's showing of probable cause to search the residence."[23] What's more, because the correct date was closer in time to the issuance of the search warrant, replacing it serves to strengthen probable cause, not weaken it.[24] After examining the error as well as the

---

interviews that we conduct.").

[20] *Butler*, 594 F.3d at 961; Mot. Hr'g Tr. 50-51 ("Q. And you mentioned facts from several law enforcement reports in your affidavit? A. Yes. Q. That you felt established probable cause – A. Yes.").

[21] *Butler*, 594 F.3d at 961.

[22] *See* Mot. Hr'g Ex. 7 at 5 (Nov. 10, 2021).

[23] *Butler*, 594 F.3d at 961-62.

[24] *See United States v. Johnson*, 848 F.3d 872, 877 (8th Cir. 2017) ("A warrant becomes stale if the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search.") (cleaned

(continued. . .)

omissions, Medearis fails to meet the high threshold of showing reckless disregard for the truth to warrant a *Franks* hearing.[25]

## 2. *Leon* Exception

Medearis also attacks the search warrant on probable cause and over breadth grounds.[26] A court though may "consider the applicability of the good-faith exception to the exclusionary rule" before "reviewing the existence of probable cause."[27] The court may likewise assume, without deciding, that the scope of the warrant was too broad and apply the exception.[28]

---

up).

[25] *See United States v. Engler*, 521 F.3d 965, 971 (8th Cir. 2008) (noting that denial of *Franks* hearing was appropriate when defendant failed "to establish that law enforcement officers deliberately or recklessly omitted information in an attempt to mislead the issuing judicial officer," "did not provide an explanation for the absence of such evidence," and "failed to make a preliminary showing that a *Franks* hearing was necessary").

[26] Docket No. 39 at 4-8.

[27] *United States v. Williams*, 976 F.3d 807, 809 (8th Cir. 2020).

[28] *United States v. Harris*, No. 20-CR-98 (SRN/TNL), 2021 WL 3929270, at *4 (D. Minn. Sept. 2, 2021); *see also United States v. Stephen*, No. 18-CR-31-CJW, 2018 WL 4839065, at *12 (N.D. Iowa Oct. 4, 2018) ("*Leon* good-faith exception applies to the assertion that the warrant was overbroad with the same force and effect as it does to the assertion that the warrant lacked probable cause), *aff'd*, 984 F.3d 625 (8th Cir.), *cert. denied*, 2021 WL 4508830 (U.S. Oct. 4, 2021) (No. 21-5163).

Under the good-faith exception, disputed evidence will not be suppressed if the executing officers' reliance on a search warrant was objectively reasonable.[29] In determining objective reasonableness, a court "can look outside the four corners of the [warrant] affidavit and consider the totality of the circumstances, including what [ ] officers knew but didn't include in the affidavit."[30] "[T]he fact that a neutral [judge] has issued a warrant is the clearest indication that [ ] officers acted in an objectively reasonable manner, or in objective good faith."[31] "[T]he threshold for establishing [that the good-faith exception dos not apply] is a high one, and it should be."[32]

The exception, however, does not apply when:

1. The affidavit or testimony supporting the warrant contained a false statement made knowingly and internationally or with reckless disregard of its truth, this misleading the issuing judge;

2. The issuing judge "wholly abandoned his judicial role" in issuing the warrant;

3. The affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and

---

[29] *United States v. Houston,* 665 F.3d 991, 994 (8th Cir. 2012).

[30] *United States v. Dickerman,* 954 F.3d 1060, 1065 98th Cir. 2020) (quoting *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014)).

[31]*Messerschmidt v. Millender,* 565 U.S. 535, 546 (2012) (internal quotation omitted).

[32]*Leon,* 468 U.S. at 923.

4. The warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.[33]

Here, none of these circumstances exists. Medearis presented no credible evidence that the tribal judge was mislead by a false statement in the affidavit that Dillon made knowingly and intentionally or with reckless disregard for the truth. The March 19, 2020 date was an inadvertent error.[34] Indeed, supplanting that date with the right one (April 19, 2020) enhances rather than dilutes, probable cause.

Nor did Medearis show, or submit evidence to suggest, that the tribal judge "wholly abandoned his judicial role" when he issued the search warrant. The judge took his time reading everything[35] and did not shirk his judicial responsibilities by rubber stamping an affidavit and warrant that were deficient and fatally flawed.[36]

Dillon's affidavit was not "bare bones" either or so insufficient that he and executing officers could not reasonably believe they had probable cause to search

---

[33] *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citing *Leon*, 468 U.S. at 923).

[34] Mot. Hr'g Tr. 52-53, 61-62.

[35] Mot Hr'g Tr. 47-48 ("Q. [H]ow long did he take to read it? A. I was in his chambers for about 20, 25 minutes.").

[36] *Compare Dickerman*, 954 F.3d at 1068-69 ("viewing the totality of the circumstances from the officers' perspective, they had no indication that the [ ] judge had failed to understand the affidavit or otherwise acted as a rubber stamp) *with United States v. Rodriquez*, No. 3:20-CR-30016-RAL, 2020 WL 6111638, at ** 2-3, 9-12 (D.S.D. Oct. 15, 2020) (the issuing judge abandoned his duties and acted as a mere rubber stamp for tribal police).

Medearis, India, and the two homes.[37] The affidavit, which itself arguably contained

enough information to support a finding of probable cause, included these and other

details:

- Law enforcement received information that Medearis and India sold methamphetamine within the Rosebud Sioux Tribe.

- On March 19, 2020 [sic], tribal officers observed a vehicle leave the India Ford/Patrick Medearis residence and, after a K-9 alert, discovered three grams of marijuana and a mirror with methamphetamine residue in the vehicle.

- On April 19, 2020, an interviewee advised Estes that Medearis owned three pistols and a rifle and that if "law enforcement wanted to stop the drugs," it should watch Medearis's house and others.

- On April 17, 2020, an interviewee, acknowledged having "heard about" India and Medearis being "around with a lot of drugs." The interviewee stated that India and Medearis lived at Shannon Wright's old residence (known by Dillon to be 1616 E. Red Cloud Road) in South Antelope. The interviewee also "heard" that Medearis had pistol whipped India and that she had several knots on her head. The interviewee likewise reported that "Medearis had a pipe with him when he returned to his residence on his four-wheeler" six or seven days ago and that there was constant traffic in and out of the house at all hours.

- On April 14, 2020, an interviewee told Antman that Medearis and India were in a relationship and described the various vehicles they drove, including a silver Grand Prix. The interviewee said that Medearis and Dale Haukaas "were bringing stuff in," and that Kara was also involved. Additionally, the interviewee mentioned that India was "strung out" and that Medearis had threatened the interviewee with a gun.

- Lastly, on April 13, 2020, an interviewee informed Antman that Medearis, while with India, held up a bag of methamphetamine and shot off a gun

---

[37] *Compare Dickerman*, 954 F.3d at 1066-67 (given the many details in the affidavit about the investigation, the officers' reliance on the warrant was objectively reasonable) *with Rodriquez*, 2020 WL 6111638, at ** 1-2, 8-9 (search warrant was so lacking in indicia of probable cause that the officers' belief in its validity was objectively unreasonable).

while accusing someone of stealing his methamphetamine. According to the interviewee, when India tried to leave in her grey or silver car, Medearis stabbed her tire, stopped her, and the two left together. Later, the interviewee said, Medearis returned and apologized after finding the missing methamphetamine.[38]

Beyond what he set forth in his affidavit, Dillon knew the following:

- When Medearis and India were "on the outs," Medearis went and stayed at his father's residence.[39] Otherwise, the two lived together in South Antelope.

- Medearis was a felon who could not possess firearms.[40]

- On April 21, 2020, Medearis chased India and shot a pistol in the air.[41]

- During the April 21 interview at the Tripp County Sheriff's Office, India provided information on the incident where Medearis accused someone of breaking into his Monte Carlo and stealing his methamphetamine and marijuana.[42]

- India also described the incident where Medearis struck her in the head with a pistol and stated that "Pat was trying to be a drug lord."[43]

- And India disclosed that Medearis had a black shotgun in his silver Grand Prix, that he sold "smaller bags" of methamphetamine from the house, and

---

[38] Mot. Hr'g Ex. 7 at 5-8.

[39] *See* Mot. Hr'g Tr. 50 ("It was known that India and Pat resided in South Antelope and that Pat was also sometimes at his dad's when him and India were on the outs."); Mot. Hr'g Tr. 71 ("A. It was pretty clear that India lived at the residence in South Antelope …. And also resided in by Pat and when Pat isn't there he also resides at his father's.").

[40]*See* Mot. Hr'g Exs. 6, 10.

[41] *See* Mot. Hr'g Ex. 4 at 1-2.

[42] *See* Mot. Hr'g Ex. 4 at 2-3.

[43] *See* Mot. Hr'g Ex. 4 at 3.

that "the last time she saw Pat with meth was last week" but he had been "out of meth" recently.[44]

- After Medearis's flight on the four-wheeler and in the silver Grand Prix from his father's residence, officers discovered a black shotgun, a rifle, ammunition, drug paraphernalia, 32 grams of marijuana, and knives on Medearis's person and in the Grand Prix.[45]

With this knowledge, Dillon submitted the search warrant, which the tribal judge reviewed for roughly 20 minutes.[46] In paragraph 5 of his warrant affidavit, Dillon made clear that "[t]his affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter."[47] Despite the paragraph, the judge chose to issue the warrant without asking further questions.[48]

---

[44] *See* Mot. Hr'g Ex. 4 at 3-4.

[45] *See* Mot. Hr'g Ex. 6.

[46] *See* Mot. Hr'g Tr. 49 ("With COVID going on – actually I had to step out of the chambers for that 20 minutes while he read it. I stood outside his door.").

[47] *See* Mot. Hr'g Ex. 7 at 4.

[48] *See Leon*, 468 U.S. at 921 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination ...."); Mot. Hr'g Tr. 56 ("A. I guess if the judge had questions on anything, they typically ask and I usually get sent back to the police department to make corrections, add, whatever it may be. Q. But you didn't get any questions? A. No.").

Considering what Dillon presented to the tribal judge (in the affidavit) and what he knew at the time,[49] it was reasonable for Dillon, and his fellow officers, to believe that the warrant the judge issued, and the searches authorized in it, were lawful.[50]

Finally, the search warrant was not so lacking in particulars or overbroad that no executing officer could reasonably presume it was invalid. Any defects in the warrant's scope were not facially obvious so that a reasonable officer would have known that it was constitutionally infirm. The warrant described, with specificity, the persons and places to be searched and the items to be seized. And there was a discernable nexus between the contraband and the persons and places identified. The good-faith exception applies and defeats Medearis's lack of particularity/overbreadth claim.[51]

**B. The Interview**

_____

[49] *See Dickerman*, 954 F.3d at 1067 ("we may consider 'what the officer[s] knew but did not include in the affidavit' to decide whether their reliance on the warrant was objectively reasonable").

[50] *See, e.g., United States v. Patterson*, 666 Fed. App'x 569, 571-72 (8th Cir. 2016) (known drug dealer's frequent visits to a home can establish nexus to search the home for contraband); *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) ("evidence of drug manufacturing and distribution" recovered from car accident scene sufficient to justify search of driver's residence); *United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007) (nexus to search individual's home exists where that person is closely tied to narcotics trafficking).

[51] *See United States v. Szczerba*, 897 F.3d 929, 936-39 (8th Cir. 2018); *see also United States v. Henderson*, 416 F.3d 686, 695 (8th Cir. 2005) (affirming finding that good-faith exception applied to overly broad warrant); *United States v. Saddler*, No. 4:19-CR-40109-01-KES, 2020 WL 6255652, at ** 5-6 (D.S.D. Oct. 23, 2020) (warrant lacking particularly upheld under good-faith exception), *appeal filed*, No. 21-1884 (8th Cir. Apr. 21, 2021).

Continuing his attempts at evidentiary preclusion, Medearis claims that the statements he made during his interview on April 27, 2020, were obtained in violation of *Miranda*[52] and involuntary under the Fifth Amendment.[53] The Court disagrees.[54]

### 1. Miranda Waiver

The waiver of *Miranda* rights may be given expressly or implied from a course of conduct.[55] The validity of a *Miranda* waiver depends on whether the waiver was both "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[56] Making this determination requires a court to consider the totality of the circumstances.[57] The government bears the burden of proving any purported waiver by a preponderance of the evidence.[58]

---

[52] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[53] Docket No. 39 at 8-11.

[54] *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.").

[55] *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010).

[56] *Id.*

[57] *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

[58] *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

The Court notes Medearis's concerns, which primarily focus on (1) the presence of drugs in his system (unknown by the interviewing officers but later discovered in a presumptive drug test),[59] (2) the fact that he wore a smock because of worries of mental instability,[60] and (3) the recent neck wound which caused him a measure of discomfort.[61] To be sure, these could all help make Medearis more susceptible to acts of coercion by law enforcement. But "even if a suspect has a somewhat diminished capacity to resist coercion due to a mental defect, a Miranda waiver will not be invalidated on that basis if there is no evidence of police coercion."[62]

About eight hours before the interview, Medearis had self-inflicted "superficial" wounds to his own neck. The wounds did not require further treatment or hospitalization according to the ambulance crew. Then, at 9:40 a.m. in a 10x10 room at the correctional facility,[63] Estes and Antman gathered routine biographical information from Medearis, who did not have his glasses, and read Medearis his *Miranda* rights.[64]

---

[59] *See* Mot. Hr'g Tr. 115 ("I didn't know that they gave him the drug test.").

[60] *See* Mot. Hr'g Tr. 113 ("Q. He was in a suicide smock, wasn't he? A. Yes.").

[61] Docket No. 39 at 9.

[62] *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011).

[63] *See* Mot. Hr'g Tr. 94 ("probably 10 by 10.").

[64] *See* Mot. Hr'g Ex. 21 at 00:00-03:33.

Medearis orally agreed to speak outside the presence of an attorney after Estes's oral recitation of *Miranda*.[65] About a minute later and at the only moment when Medearis exhibited signs of discomfort from his wound,[66] officers offered to leave and come back later.[67] In response, Medearis said, "let's just talk, let's go."[68] After making this statement, Medearis initialed the waiver portion of the advice of rights form[69] and engaged in a back and forth dialogue with the unarmed[70] officers for 34 minutes.[71]

Despite Medearis's potential vulnerabilities, he appears lucid and in control, on the audio recording, throughout the interview.[72] At no time did officers threaten,

---

[65] *See* Mot. Hr'g Ex. 21 at 04:20-04:25 ("Did you want to talk to us?" "Yeah, I do, but-").

[66] *See* Mot. Hr'g Ex. 21 at 04:48-05:30 ("It feels like I'm breathing out my neck, like air …" "If you agree to talk to us, if you do, then, without a lawyer present, just go ahead and sign it right there." "Probably sign that …").

[67] *See* Mot. Hr'g Ex. 21 at 05:44-05:52 ("Do you want to talk to us later on today? You want us to come back later on today? It's up to you.").

[68] *See* Mot. Hr'g Ex. 21 at 05:54-05:56.

[69] *See* Mot. Hr'g Ex. 21 at 05:56-06:20 ("Okay, if you agree to talk to us without a lawyer present, just sign it right there." "How about I initial it?" "Okay."); Mot. Hr'g Ex. 18.

[70] *See* Mot. Hr'g Tr. 95 ("Q. … nobody had a firearm in the interview? A. No.").

[71] *See* Mot. Hr'g Ex. 21 at 06:20-40:10.

[72] See *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (finding waiver valid when a suspect did not sleep and consumed drugs and alcohol the night before an interview but appeared cooperative and calm to the interviewer); *United States v. LaForge*, No. 3:19-CR-30065-RAL, 2019 WL 4410301, at *2-3 (D.S.D. Sept. 16, 2019) (finding valid waiver and voluntariness despite claims of

(continued. . .)

intimidate, pressure or lay hands on Medearis or use strong arm tactics (such as brandishing a firearm) to get him to waive his rights and talk.[73] Nor did officers raise their voices or make promises or statements that might otherwise be construed as improperly coercive or deceptive.[74] Instead, officers told Medearis that he could end the interview at any time[75] and informed him that he was free to answer or not as he saw fit.[76] On this record, Medearis's decision to waive his *Miranda* rights was the "product of free and deliberate choice."

Medearis also appears to have had the wherewithal to comprehend his rights and to understand the consequences of waiving them.[77] Despite having drugs in his

---

intoxication).

[73] *See Vinton*, 631 F.3d at 483-84 (finding valid waiver and statements voluntary absent a showing that defendant "was intimidated, coerced, or threatened by the police prior to or during his interview"); Mot. Hr'g Tr. 131 ("Q. Did you use any force on him to get him to waive his *Miranda* rights or talk to you? A. No….").

[74] *See* Mot. Hr'g Tr. 132 ("Q. Did you or any of the agents engage in any misrepresentations in an effort to get him to talk to you or tell you things that you were looking for? A. No.").

[75] *See* Mot. Hr'g Ex. 21 at 04:40-04:43 ("You can still stop the interview whenever you want.").

[76] *See* Mot. Hr'g Ex. 21 at 04:43-04:53 ("If there's, if there's a particular question we're asking and you don't want to answer it, you don't have to answer if you don't want to. It just tells us that you know your rights and you're agreeing to answer any questions without a lawyer present.").

[77] *See* Mot. Hr'g Ex. 21 at 03:30-03:33 ("Do you understand what I read to you?" "Yeah.").

system,[78] Medearis was able to freely converse and have an intelligent conversation with officers.[79] Medearis had experience with the criminal justice system,[80] and preceding Estes' oral *Miranda* recital, Medearis responsively answered questions, providing his full name, date of birth, and Social Security number. Notably, Medearis expressed the clarity of mind to deny several wrongdoings,[81] and to blame India for the gun and drug related misconduct.[82]

---

[78] *See United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) (finding waiver even if defendant was intoxicated by PCP); Mot. Hr'g Tr. 100 ("Q. Did you have any … involvement in the drug test that is related to that report at Exhibit 17? A. No.").

[79] *See United States v. Little Hoop*, No. 3:19-CR-30121-RAL, 2020 WL 7310898, at *3-4 (D.S.D. Dec. 11, 2020) ("The Eighth Circuit has found waivers to be valid even when the defendants were under the influence so long as the defendants appeared sober and as though they understood their rights."); Mot. Hr'g Tr. 98 ("Q. At the time of your interview, did you make any observations of the Defendant that he was under the influence of alcohol or controlled substances? A. No."); Mot. Hr'g Tr. 99 ("Q. Did it seem that he was capable of going through the interview with you? A. Yes.").

[80] *See* Docket No. 17 at 4-7; *see also* Mot. Hr'g Tr. 102 ("I can't remember exact year, but it was early in my career. He was indicted for drugs. Q. For a conspiracy charge, correct? A. Correct.").

[81] *See* Mot. Hr'g Ex. 21 at 10:13-10:30 (Medearis: "I wasn't shooting at her. I'll put that on my dead baby's grave, I did not shoot at her. She had that pistol."); 15:07-15:10 (Medearis: "I didn't fucking hold no gun to nobody though, I put that on my mama's grave."); 29:52-29:55 (Estes: "Why did you hit her in the head with a pistol?" Medearis: "I didn't hit nobody in the head with a pistol.").

[82] *See* Mot. Hr'g Ex. 21 at 09:51-10:12 (Estes: "I want to get that pistol back. I want to get it out of the hands so we don't have to worry about it." Medearis: "I don't got it, India has all that shit. Ben, I swear to God, give me a Bible, I'll fucking, India has that." Estes: "Well how did she get it? Because you had it earlier."

(continued. . .)

Medearis knowingly, intelligently, and voluntarily waived his rights when he both orally agreed to speak with officers, outside the presence of an attorney, and physically initialed the waiver in the advice of rights form. Having made his statements in compliance with *Miranda*, Medearis has no room to complain.

**2. Voluntariness**

Medearis next claims that his statements were involuntary under the Fifth Amendment because he had recently woken up, two officers questioned him, he had a neck wound and did not understand his rights, and the crime had been solved.[83] Voluntariness in the Fifth Amendment and *Miranda* waiver contexts is essentially the same inquiry.[84] As already discussed, Estes and Antman did not coerce Medearis, overbear his will, or critically impair his capacity for self-determination. Medearis made his statements voluntarily and in accord with the Fifth Amendment.[85]

**CONCLUSION**

Medearis failed to establish that Dillon's omissions and erroneous date, in the search warrant affidavit, were knowing and intentional or done with reckless disregard

---

Medearis: "I didn't have it."); 21:00-21:15 (Antman: "So, what about all the traffic that come into your house, that house? … I'm talking about recently since you guys moved in." Medearis: "Those are mostly all her friends that came over.").

[83] Docket No. 39 at 11.

[84] *Connelly*, 479 U.S. at 170; *United States v. Havlik*, 710 F.3d 818, 822 (8th Cir. 2013).

[85] *See United States v. LeBrun*, 363 F.3d 715, 724-26 (8th Cir. 2004) *(en banc).*

for the truth. He is therefore not entitled to a hearing or relief under *Franks*. And because Dillon and his brethren acted in good-faith reliance on a warrant they reasonably believed was proper, the evidence seized from the homes and vehicles is not subject to suppression. Medearis's statements later on are likewise admissible because he validly waived his rights and spoke voluntarily to officers.

## RECOMMENDATION

Based on the authorities and legal analysis set forth in this report, and the record now before the Court, it is

RECOMMENDED that Medearis's motion and supplemental motion to suppress and request for a *Franks* hearing[86] be denied.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to file their objections to the same.[87] Unless an extension of time for cause is later obtained,[88] failure to file timely objections will result in the waiver of the

---

[86] *See* Docket No. 38, 45.

[87] *See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[88] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

right to appeal questions of fact.[89] Objections must "identify[] those issues on which further review is desired[.]"[90]

Dated this 24th day of November, 2021, at Pierre, South Dakota.

BY THE COURT:

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

---

[89]*See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[90]*Arn*, 474 U.S. at 155.